**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHERYL CALDWELL, Individually and on Behalf of All Others Similarly Situated,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **Civil Action No. 3:17-cv-1552-C** |
| **REO CONTRACTORS, INC., KINDALE PITTMAN, individually, and HOLLY KIRK, individually,** | § § § § | **Jury Demanded** |
| **Defendants.** | § § § § | |

**APPENDIX TO PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,**
**IN THE ALTERNATIVE, PLAINTIFF'S MOTION FOR CONTINUANCE**

Pursuant to Local Rule 56.6, Plaintiff files this Appendix to Plaintiff's Response to Defendants' Motion for Summary Judgment or, in the alternative, Plaintiff's Motion for Continuance, and shows:

| DESCRIPTION | APPENDIX PAGES |
|---|---|
| Declaration of Travis Gasper | App. 3–4 |
| Declaration of Cheryl Caldwell | App. 5–6 |
| Transcript Excerpts from Deposition of Plaintiff Cheryl Caldwell | App. 7–19 |
| Transcript Excerpts from Deposition of Defendant REO Contractors, Inc. | App. 20–42 |

Respectfully submitted,

/s/ Travis Gasper
**J. DEREK BRAZIEL**
*Co-Attorney in Charge*
Texas Bar No. 00793380
jdbraziel@l-b-law.com
**TRAVIS GASPER**
Texas Bar No. 24096881
gasper@l-b-law.com
Lee & Braziel, L.L.P.
1801 N. Lamar Street, Suite 325
Dallas, Texas  75202
(214) 749-1400 phone
(214) 749-1010 fax

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record through the Court's ECF system as of the date file-stamped thereon.

/s/ Travis Gasper
**TRAVIS GASPER**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHERYL CALDWELL, Individually and** | § | |
| **on Behalf of All Others Similarly Situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:17-cv-1552-C** |
| **REO CONTRACTORS, INC., KINDALE** | § | |
| **PITTMAN, individually, and HOLLY** | § | **Jury Demanded** |
| **KIRK, individually,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## DECLARATION OF TRAVIS GASPER

I am over the age of 18, am competent to testify to the following from my personal experience and knowledge, and declare as follows:

1.      My name is Travis Gasper. I am an attorney in the law firm of Lee & Braziel, LLP and am one of the attorneys representing Plaintiff Cheryl Caldwell ("Plaintiff") in this matter.

2.      Discovery in this lawsuit ends on December 17, 2018 (Doc. 7). The dispositive motion deadline was October 1, 2018 (Doc. 16). As discussed herein, discovery in this matter is ongoing.

3.      On October 17, 2018, Plaintiff filed a motion to compel discovery (Doc. 39). At issue in the motion to compel are Defendants' failure to produce names and contact information of individuals with "knowledge of the relevant facts relating to the subject matter of this

litigation,"[1] and Defendants' failure to produce documents "regarding correspondence and other documents sent to or received from the Department of Labor ("DOL") concerning any investigation of Defendants."[2]

4.      The discovery responses and documents at issue in the motion to compel may directly support Plaintiff's allegations and refute Defendants' defenses, and therefore would serve to create a genuine issue of material fact sufficient to oppose and defeat Defendants' Motion for Summary Judgment, including without limitation the following facts:

a.   Whether the DOL found Defendants properly classified Plaintiff and employees in similarly positions as exempt or non-exempt from overtime under the FLSA;

b.   Reasons why the DOL allegedly found some of Defendants' employees non-exempt from the FLSA's overtime protection (like Plaintiff);

c.   Job descriptions for current and former Customer Service Representatives ("CSRs") like Plaintiff; and

d.   Names and contact information for Defendants' employees with knowledge of the relevant facts relating to the subject matter of this litigation, including employees who participated in the DOL investigation.

5.      For the reasons set forth in Plaintiff's motion to compel (Doc. 39), Plaintiff has not delayed in pursuing or obtaining the discovery outlined above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>November 6, 2018</u>.

_Travis Gasper_

Travis Gasper

---

[1] Doc. 39 at 2-3.
[2] Doc. 39 at 5.

**DECLARATION OF TRAVIS GASPER**                                                         **Page - 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHERYL CALDWELL, Individually and on Behalf of All Others Similarly Situated,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **Civil Action No. 3:17-cv-1552-C** |
| **REO CONTRACTORS, INC., KINDALE PITTMAN, individually, and HOLLY KIRK, individually,** | § § § § | **Jury Demanded** |
| **Defendants.** | § § § | |

---

## DECLARATION OF CHERYL CALDWELL

---

I am over the age of 18, am competent to testify to the following from my personal experience and knowledge, and declare as follows:

1.      Defendants REO Contractors, Inc., Kindale Pittman, and Holly Kirk (collectively, "REO" or "Defendants") employed me as a Customer Service Representative ("CSR") from approximately July 9, 2009, to approximately July 13, 2016.

2.      I was paid on a salary basis of at least $455.00 per week.

3.      As a CSR, primary duty was the performing routine clerical and non-manual tasks, such as taking direction from management, quality assurance inspectors, and field superintendents; typing up summaries of work to be performed based on that information; updating notes and files; and answering phones.

4.      As a CSR, I had minimal or no discretion on how to perform my job because every significant aspect of my job was covered by REO-implemented policies and procedures I was

**DECLARATION OF CHERYL CALDWELL**                                    **Page - 1**

DocuSign Envelope ID: A6D21C3A-EE7B-4E26-AD71-E5EAC47F80F6

required to follow. I did not have the authority to formulate, affect, interpret, or implement management policies or operating practices. I did not carry out major assignments in conducting the operation of the business. I did not perform work that affected business operations to a substantial degree. I did not have the authority to commit Defendants in matters that have significant financial impact. I did not have the authority to waive or deviate from established policies and procedures without prior approval. I did not have authority to negotiate and bind the company on significant matters. I did not provide consultation or expert advice to management. I was not involved in planning long- or short-term business objectives. I did not investigate and/or resolve matters of significance on behalf of management. I did not represent the company in handling complaints, arbitrating disputes, or resolving grievances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _11/7/2018_____.

DocuSigned by:

*Cheryl Caldwell*

C465AC9A13024CD...

Cheryl Caldwell

**DECLARATION OF CHERYL CALDWELL**

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3    CHERYL CALDWELL,           )
     individually and on Behalf)
4    Of All Others Similarly    )
     Situated,                  )
5                               )
          Plaintiff,            )
6                               )
     VS.                        ) CASE NO.:  3:17-cv-1552
7                               )
     REO CONTRACTORS, INC.,     )
8    KINDALE PITTMAN,           )
     individually, and HOLLY    )
9    KIRK, individually,        )
                                )
10        Defendants.           )

11        _____

12            ORAL AND VIDEOTAPED DEPOSITION OF

13                    CHERYL CALDWELL

14                  SEPTEMBER 28, 2018
          _____

15

16

17            ORAL AND VIDEOTAPED DEPOSITION OF CHERYL

18    CALDWELL, produced as a witness at the instance of the

19    Defendants, and duly sworn, was taken in the

20    above-styled and numbered cause on September 28, 2018,

21    from 1:44 p.m. to 5:09 p.m., before Ashley Gattenby,

22    CSR, RPR in and for the State of Texas, reported by

23    machine shorthand, at Clark Firm, PLLC, 10000 North

24    Central Expressway, Suite 400, Dallas, Texas 75231,

25    pursuant to the Federal Rules of Civil Procedure.

1              A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3         Mr. Travis Gasper
          LEE & BRAZIEL, LLP
4         1801 North Lamar Street, Suite 325
          Dallas, Texas 75202
5         (214)749-1400
          (214)749-1010 Fax
6         gasper@l-b-law.com

7    FOR THE DEFENDANT:

8         Mr. Steven E. Clark
          CLARK FIRM, PLLC
9         10000 North Central Expressway, Suite 400
          Dallas, Texas 75231
10        (214)890-4066
          (214)890-4013 Fax
11        sclark@dfwlaborlaw.com

12   ALSO PRESENT:

13        Holly Kirk
          Holland Hendley
14        Jonathan Muriel (enters page 35)
          David Guerra, Videographer

15

16

17

18

19

20

21

22

23

24

25

1      A.    I did.

2      Q.    Okay.  And you heard Ms. Kirk, I'm trying to

3  shorten things, talk about there were -- as I understand

4  it there were year-end bonuses and then there were

5  bonuses that were paid over the holidays; is that

6  consistent with your memory?

7      A.    Yes.  When I started, they were supposed to be

8  quarterly bonuses, but then they ended up being yearly

9  bonuses.

10     Q.    Okay.  So it changed?

11     A.    Uh-huh.

12     Q.    So can you describe for me what additional

13  responsibilities you took on under the title of CSR over

14  the course of the eight years you were there, I guess?

15     A.    Additional responsibilities, I mean, the

16  customer service duties that I did.  I mean, they didn't

17  really change that much.  I mean, they had a set

18  procedure that we followed.

19     Q.    Okay.

20     A.    I mean, additional responsibilities I took on,

21  I mean, I sort of coordinated appliances, you know, but,

22  I mean, I still had to have somebody approve anything

23  that I ordered.

24     Q.    Did you have authority to order anything up to

25  a certain amount?

1      A.    No.

2      Q.    So everything had to be approved?

3      A.    Uh-huh.

4      Q.    Who was your point of approval?

5      A.    Well, the bid person did the bid and then

6  Kelvin would have to approve whatever it was that was

7  being actually being ordered.

8      Q.    Kelvin?

9      A.    Kelvin.

10      Q.    Well, do you know Kelvin's last name?

11      A.    Chochi (phonetic).

12      Q.    Just so we have the right people.

13      A.    Yeah.

14      Q.    Let's go ahead and mark this.

15            (Exhibit No. 5 marked.)

16      Q.    This is a document that came out of your

17  personnel files, and it said CSR job description.

18      A.    Okay.

19      Q.    So, first of all, let me just ask you, do you

20  recognize the document?

21      A.    Okay.  Yes.

22      Q.    All right.  Can you identify it?

23      A.    It looks like something that I might have

24  written as my job description to her.

25      Q.    Okay.  This is not dated.  Looking at it at

1      A.   Yeah.

2      Q.   So when you put Exhibit 6 together, this was

3  sort of a training guide, if you will?

4      A.   It was basically just so that it made the

5  policies and procedures easier to follow because we had

6  a lot of things that we had to do that were, you know,

7  required.

8      Q.   Okay.

9      A.   Like in our portals and stuff, so this just

10  made it easier to follow, to make sure you got every

11  single thing done.

12      Q.   Okay.  Were you asked to prepare this?

13      A.   No.

14      Q.   So this was something you took upon yourself?

15      A.   Yes.

16      Q.   And did -- was it distributed to the other

17  people?

18      A.   No.

19      Q.   All right.  So after you prepared it, what did

20  you do with it?

21      A.   I gave it to Kindale.

22      Q.   Kindale.  Okay.  How did Kindale respond?

23      A.   He liked it.

24      Q.   All right.  Anything -- anything else, did he

25  say share it with other people?

1        A.    No, he liked it and then he put it away, and

2    it was -- I got the feeling that it wasn't just supposed

3    to be around.

4        Q.    Why?

5        A.    I don't know.  Holly didn't like it.

6        Q.    What?

7        A.    Holly didn't like it.

8        Q.    Okay.  You had a conversation with her about

9    it?

10       A.    I just got -- I had a conversation with

11   Kindale, and I don't know if Holly and I ever really

12   talked about it, but, I mean, it just kind of went away.

13   I used it still for my own person -- when I trained

14   people, I used it.

15       Q.    Okay.  All right.  And if we -- I'm not going

16   to spend the time unless we need to, but generally

17   speaking, does this, kind of, describe on a day in, day

18   out basis what you were doing as a CSR?

19       A.    Yes.

20       Q.    Is that a pretty fair statement?

21       A.    Yes.

22       Q.    And you think all of this -- all these

23   descriptions of what you did, you were only a clerical

24   employee?

25       A.    Yes.

1    Q.    So your belief is that everything in here is

2  just clerical duties?

3    A.    Yes.

4    Q.    Did you ever have to exercise any judgment to

5  perform any of your job duties?

6    A.    Judgment?

7    Q.    Yeah.  Make decisions.

8    A.    I mean, everything was pretty much to form.

9  There was a policy or procedure for everything I did.

10    Q.    Okay.

11    A.    So there wasn't a whole lot of judgment

12  involved.

13    Q.    Was there any judgment involved?

14    A.    Well, sure.

15    Q.    Okay.  Can you tell me types of judgment that

16  you had to make on a daily basis?

17    A.    Let me think about it.  Well, rephrase your

18  question, if you don't mind.

19    Q.    Sure.  Whether this is helpful or from your

20  own memory, can you tell me the type of judgments you

21  would have to make in performing your job duties as a

22  CSR at REO?

23    A.    I suppose like if there was things that was

24  missing I would have to make a judgment whether or not

25  we were going to send it to Kindale for approval or not

1    to do extra things.

2        Q.    Okay.  Would you have to decide what needed to

3    be ordered on given projects that you were working with?

4        A.    No.

5        Q.    Who made those decisions?

6        A.    It was already on the bid, approved bid.

7        Q.    Okay.  Was there any discretion at all in

8    terms of how many got ordered or who you ordered from

9    or --

10        A.    Who we ordered from.

11        Q.    Or how much we paid for it?

12        A.    Who we ordered from was more like a judgment,

13    but, I mean, like, I would have to use my judgment to go

14    out and find people that, you know, were reputable or

15    whatever and bring them back to Kindale so he could

16    approve them.

17        Q.    Okay.

18        A.    I mean, that's not really a judgment call, I

19    wouldn't think.  I don't know.

20        Q.    All right.  Anything else that you can think

21    of?

22        A.    No.

23        Q.    There's another term called "discretion."  Do

24    you feel like you had any discretion in performing your

25    job duties?

```
 1        A.    No.

 2        Q.    Everything was just rote tasks?

 3        A.    Yes.

 4        Q.    No real thinking involved; is that correct?

 5        A.    Everything was policy and procedures, not

 6    thinking --

 7        Q.    I understand.  Every company has policies and

 8    procedures, and all the employees are expected to follow

 9    policies and procedures --

10        A.    Right.

11        Q.    -- correct?  And if they don't, the company

12    generally gets rid of them, right?

13        A.    Yes.

14        Q.    So you understood over the course of working

15    there for eight years what the policies and procedures

16    were, correct?

17        A.    They changed all the time.

18        Q.    Right.  But you kept up with them and you

19    performed well?

20        A.    Yes.

21        Q.    And you were paid well?

22        A.    Yes.

23        Q.    So what -- but what I'm trying to figure out

24    is did you have any discretion, or were you just

25    performing the same tasks spelled out for you, you know,
```

```
 1        A.    It was a routine task that I did.  I did it

 2   frequently.

 3        Q.    Right.  But as far as -- it was an important

 4   task --

 5        A.    Yes.

 6        Q.    -- that actually affected the bottom line for

 7   the company, right?

 8        A.    It affected the bottom line for the company?

 9   I mean, I don't know what you mean by that exactly.

10        Q.    Well, I mean, let's back up to the beginning

11   of the bullet.  I've managed 600 jobs or projects, would

12   represent approximately $5 million in sales, right?

13        A.    Yes.

14        Q.    So that's a significant amount of money?

15        A.    Yes.

16        Q.    When I talk about the bottom line --

17        A.    Right.

18        Q.    -- that's --

19        A.    Okay.

20        Q.    -- what we're talking about.

21        A.    Yes.

22        Q.    Okay.  And so the type of work you did

23   impacted the bottom line, didn't it?

24        A.    I was taking a document that was on a bid, and

25   I was just putting it on another document.  I was just,
```

1   basically, taking the words from the bid and putting it

2   on a document that the guys worked off of.

3        Q.   Right.

4        A.   So I was, basically, taking one document and

5   putting it onto another document.

6        Q.   But you had to put it onto a document so the

7   workers could easily understand it --

8        A.   Right.

9        Q.   -- and undertake the repairs within the scope

10  of the work to be performed, right?

11       A.   Yes.

12       Q.   For each job?

13       A.   Yes, and it was, basically, just one document

14  that was approved, putting it on another document for

15  the guys -- a list so they could work off of it.

16       Q.   All right.  And would you interact with the

17  guys on each of these recaps once you prepared them?

18       A.   Yes.

19       Q.   So that was part of your job as well, wasn't

20  it?

21       A.   Well, once the recap was done, it was done.

22       Q.   Right.  But you have -- that wasn't the end of

23  your involvement with them, once the recap was done, was

24  it?

25       A.   No.

 1       A.    For sure.

 2       Q.    Okay.  Next bullet is that you worked closely

 3  as a team liaison between field superintendents and QC

 4  personnel.  Is that accurate?

 5       A.    Yes.

 6       Q.    To schedule tasks, coordinate subcontractor

 7  repairs, purchase material and ensure deliveries so that

 8  each project's repairs and inspections were timely

 9  completed and deadlines met?

10       A.    Yes.  Let me interject here.  When I say to

11  schedule stuff, I only scheduled what the guys told me

12  to schedule.

13       Q.    Okay.

14       A.    When they wanted it.

15       Q.    But when you wrote this, you were accurately

16  trying to describe what you did to help the company --

17       A.    Yes.

18       Q.    -- in performing your job duties, right?

19       A.    But I had boundaries.

20       Q.    Everybody has boundaries, right?

21       A.    Okay.  Right.

22       Q.    Except maybe the owner?

23       A.    Right.

24       Q.    But you were trying to expand your boundaries;

25  isn't that a fair statement?

1      Q.    But you're the one who used the phrase, took

2   on additional responsibilities?

3      A.    Yes, I --

4      Q.    That's what I'm trying to find out is what

5   were those additional responsibilities?

6      A.    Well, anytime that somebody was laid off, I

7   took on part of their duties, whatever it was.

8      Q.    Okay.

9      A.    You know, whether it be phones, whether it

10   be -- I can't even remember now, but anytime somebody

11   got laid off it was the CSRs that absorbed their jobs.

12      Q.    Okay.  So you were doing a lot more at the end

13   as a CSR than you were at the beginning; isn't that

14   true?

15      A.    As in any job, yes.

16      Q.    Okay.  And you thought a more accurate way to

17   describe the way you were effectively functioning at the

18   end of your job was as a project coordinator; is that

19   true?

20      A.    I did a lot of customer service, too, but I

21   did project coordination, too, yes.

22      Q.    Okay.

23                MR. CLARK:  Do you want to take a short

24   break?

25                THE WITNESS:  I'm good.

Holly Jo Kirk     9/27/2018

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF TEXAS

3           DALLAS DIVISION

4

5  CHERYL CALDWELL,     *
    INDIVIDUALLY AND ON   *
    BEHALF OF ALL OTHERS   *
6  SIMILARLY SITUATED    *
        PLAINTIFF,   *
7              *
    VS.        * NO. 3:17-cv-1552-C
8              *
    REO CONTRACTORS, INC.,  *
9  KINDALE PITTMAN,    *
    INDIVIDUALLY, AND HOLLY  *
10  KIRK, INDIVIDUALLY   *
        DEFENDANTS.  *

11

12     -------------------------------------

13        ORAL DEPOSITION OF

14         HOLLY JO KIRK

15       SEPTEMBER 27, 2018

16     -------------------------------------

17

18

19

20

21

22

23

24

25

Holly Jo Kirk      9/27/2018

1          ANSWERS AND DEPOSITION of HOLLY JO KIRK, a

2     witness produced on behalf of the Plaintiff, taken in

3     the above styled and numbered cause on the 27th day of

4     September, 2018, from 9:38 a.m. to 3:32 p.m. before

5     Kathy Bradford, a Certified Court Reporter in and for

6     the State of Texas, taken in the offices of Clark

7     Firm, PLLC, 10000 North Central Expressway, Suite 400,

8     City of Dallas, County of Dallas, State of Texas, in

9     accordance with the Federal Rules.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Holly Jo Kirk     9/27/2018

```
1              A P P E A R A N C E S

2     FOR THE PLAINTIFF, CHERYL CALDWELL, INDIVIDUALLY AND
      ON BEHALF OF ALL OTHER SIMILARLY SITUATED:
3
          Mr. Travis Gasper
4         LEE & BRAZIEL, LLP
          1801 North Lamar Street, Suite 325
5         Dallas, Texas  75202
          Phone:  (214) 749-1400
6         gasper@l-b-law.com

7     FOR THE DEFENDANT, REO CONTRACTORS, INC.:

8         Mr. Steven E. Clark
          CLARK FIRM, PLLC
9         10000 North Central Expressway, Suite 400
          Dallas, Texas  75231
10        Phone:  (214) 890-4066
          sclark@dfwlaborlaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Holly Jo Kirk     9/27/2018

1      A.  Yes.

2      Q.  Thank you.  And for the court reporter's

3  benefit, she's taking down words but can't take down

4  uh-huhs or huh-uhs or head nods, anything like that.

5  So please try to say yes or no where appropriate.

6            Also, let's try not to talk over each

7  other.  There may be times when you think you know

8  exactly where I'm going with the question.  You

9  probably do; but if you can just let me get it all the

10  way to the end, that helps the court reporter, as

11  well.

12            I'm sure Steven told you this; but I may

13  ask a bad question or two that doesn't make sense.

14  That's when I want you to say please explain or

15  rephrase, and I'm happy to do that.

16            So this morning, you are here

17  representing the company REO.  Do you understand that?

18      A.  Yes.

19      Q.  And that means that your answers to this

20  deposition are the company's answers.  Does that make

21  sense?

22      A.  Yes.

23      Q.  Okay.  So when Ms. Kirk says yes, that means

24  REO is saying yes.  No means REO says no.  If you say

25  "I don't know," that means the company doesn't know.

Holly Jo Kirk     9/27/2018

1    as Exhibit 2.

2            (Exhibit 2 Marked.)

3       Q.  (BY MR. GASPER)  I handed you Exhibit 2.

4    It's Defendant's Original Answer.  If you can please

5    take a look, and then we'll talk about it.

6       A.  Can I get a pen?

7            MR. CLARK:  There's one if you needed

8    it.

9            THE WITNESS:  Okay.

10      Q.  (BY MR. GASPER)  If you can just turn with me

11   to Page 3 and look at Paragraph 32.  It's under the

12   heading or the section Affirmative Defenses and says

13   Defendants would show that the U.S. Department of

14   Labor determined that REO's current CSR employee(s)

15   is properly classified as salary.  Did I read that

16   correctly?

17      A.  Yes.

18      Q.  And who is that referring to?

19      A.  Our CSR would be Tracy Fox.

20      Q.  And so Ms. Fox is paid a salary?

21      A.  Correct.

22      Q.  And exempt from overtime?

23      A.  Correct.

24      Q.  And that was determined by the Department of

25   Labor, correct?

Holly Jo Kirk     9/27/2018

1     A.  As far as I know, yes.

2     Q.  Does Ms. Fox's role as a CSR differ from the

3   role that Ms. Caldwell played as a CSR, or were they

4   doing similar job functions?

5     A.  Yes, their jobs are very similar.  The -- any

6   change in it would be only what has resulted from

7   declining business.

8     Q.  And what changes occurred?

9     A.  Right offhand, I can't -- I can't tell you.

10   I would have to look back to see.

11     Q.  But day-to-day, just pretty similar?

12     A.  Uh-huh.

13     Q.  Flip to the next page, please, to Paragraph

14   34.  It states Defendant REO would show that pursuant

15   to company policy, it kept systematic records of its

16   employees' hours of work and that there were no

17   recordkeeping or intentional violations of the FLSA.

18   Did I read that correctly?

19     A.  Yes.

20     Q.  What's the company's policy regarding

21   recordkeeping?

22     A.  Well, I'm -- I went through the TWC audit.

23   And I asked a lot of questions at that time.  And the

24   information the guy told me was their pay stubs, the

25   records, the payroll records would be my -- my

Holly Jo Kirk    9/27/2018

1      Q.  But you also said that you went off of this

2    to determine her exemption status.  Is that also

3    correct?

4      A.  I didn't say that.  I said I went off of this

5    to go off of the current CSR's exemption status.

6      Q.  Okay.  For reconciling the job --

7      A.  Uh-huh.

8      Q.  -- she's looking at the -- comparing the

9    approval and a bid.  Is that what you said?

10     A.  That is correct.

11     Q.  Okay.  Approval, who -- who -- what is she

12   approving?

13     A.  Okay.  I'm -- I'm -- the bank or the customer

14   because it could be a broker or it may be the bank.

15   They send in -- because they're real estate owned, you

16   usually have the banks and then you have the brokers.

17     Q.  Okay.

18     A.  Okay.  Overall, the bank will send in the

19   approval; but it could be a smaller job.  So it may

20   just be coming in or it may not even be an REO.  It

21   may be coming in from the brokers.  We go -- go out,

22   and we do a bid.

23        They can tell us what they want us to

24   bid on.  And then if we find extra work that needs to

25   be bid on, then our estimator can list those items.

Holly Jo Kirk    9/27/2018

1      Q.  It's an estimator that's listing those items?

2      A.  That's correct.

3      Q.  On the bid?

4      A.  Uh-huh, whenever he goes out to do the bid.

5      Q.  What's Ms. Caldwell's role in the bid?

6      A.  Just reconcile -- I don't know that --

7    reconciling it once -- once it's approved and then.

8    she may have typed some bids up.  And I know that she

9    was party to change orders.  And that's a whole

10   different -- another long story.

11     Q.  So she may have typed some bids up, but she's

12   not -- it's the estimator that's responsible for the

13   contents of the bid?

14     A.  For the information that's in the bid that --

15   the initial bid, yes.

16     Q.  Okay.

17     A.  For the approval part, it is the CSR's

18   responsibility to make sure that we're not doing work

19   that we haven't gotten approval for or that we've gone

20   back to the customer to get the additional funds that

21   need -- that's needed.

22     Q.  But the customer is approving it, not

23   Ms. Caldwell.  Who is doing the approval?

24     A.  The bank sends in an approval.

25     Q.  Okay.

Holly Jo Kirk     9/27/2018

1        A.  Or the customer sends in an approval once

2    we've done it, but their approval quite often won't

3    match what we bid.  So it's Ms. Caldwell's position to

4    make sure that we're getting all of our money, that

5    all of our money is accounted for.

6              So there may be where they approved

7    appliances and they've only approved to have a

8    washer -- a dishwasher and a stove; but whenever they

9    send in the approval, they say, well, we want a

10   dishwasher, stove, and a microwave.

11       Q.  Okay.

12       A.  So they're trying to slip through that

13   microwave.  Well, it's Ms. Caldwell's responsibility

14   to make sure that, oh, hey, nobody's bid for this

15   microwave; we need to go back to get more money for

16   that.  That's the --

17       Q.  So she's comparing the two and making sure

18   that they reconcile?

19       A.  Uh-huh.

20       Q.  And that makes her exempt?

21       A.  That's one of the many items.  It's

22   pertaining to our money.  So, yes, it would be an

23   administrative type role.

24       Q.  E-mail KP for copy of bid review notes, what

25   is that referring to?

Holly Jo Kirk     9/27/2018

1          A.  Now, that says KP, not HK; but that's where I

2     believe on Fannie Mae -- and I don't know if it's for

3     all the banks.  I do know one bank.  They -- they can

4     only have one person that they send stuff to.

5                And so we have one e-mail address.  They

6     don't have the capability to have multiple e-mail

7     addresses.  So it would be where they're e-mailing on

8     the master of e-mail, I guess --

9          Q.  Okay.

10         A.  -- the review notes of what's -- what items

11    are missing, why there's adjustments, why it wouldn't

12    reconcile if there's -- if there's any there to be

13    had.

14         Q.  And if there's an issue, if it doesn't

15    reconcile, what happens then?

16         A.  Ms. Caldwell would notify the -- the broker,

17    I want to say.  Like I said, I'm going to say it

18    again, I didn't do this part of it; so it was many,

19    many years that I -- it changed a lot.

20               She would reach out to the brokers to

21    let them know that it did not reconcile and if we

22    needed to go back for a -- a change order or get

23    approval for additional money from the broker or

24    whatever procedure they needed to take.

25         Q.  And who was the one that makes that approval?

Osteen & Associates Reporting Services
817-498-9990

**App. 29**

Holly Jo Kirk     9/27/2018

1    Who makes that decision?

2        A.  It would be the broker of the bank, I would

3    think.

4        Q.  Okay.  Not Ms. Caldwell?

5        A.  Only if they're going to do the work?  No,

6    she would -- it would be her -- her decision to go

7    back to them to find out about it, yes.

8        Q.  So sometimes she -- if it didn't reconcile,

9    sometimes she wouldn't go back to them?

10       A.  I'm not sure.  I -- I can't answer that.

11       Q.  Because you've worked at the company 20 plus

12   years --

13       A.  Okay.

14       Q.  -- are CSR's expected to go back if something

15   doesn't reconcile and inflect that, or is that up to

16   them?

17       A.  Ask the question again.

18       Q.  If the approval and the bid don't reconcile,

19   you mentioned the CSR would go back for a change order

20   or additional approval; but it was up to them.  Does

21   that mean it's up to the CSR to do that?

22       A.  To go back to the --

23       Q.  Yes.

24       A.  -- brokers?  As far as I know, yes, it was

25   standard procedure.

Holly Jo Kirk     9/27/2018

1      Q.  Okay.  So that's what I'm asking.

2      A.  Yeah.

3      Q.  That's what I'm asking.

4      A.  Okay.

5      Q.  And maybe -- sorry if I didn't ask it well.

6   I'm learning the lingo, too.

7      A.  Right.

8      Q.  But it wasn't something that the CSR decided

9   "I'm just going to pass on this one."  It was

10   something that they had to go back and fix or address,

11   right?

12      A.  He -- okay.  Yes, I would say -- I would say

13   that's a correct statement, yes.  If -- if it doesn't

14   balance, we've got to make sure that our customer is

15   happy and that our money is there, so yes.

16      Q.  And Ms. Caldwell couldn't throw in a free

17   microwave, could she?

18      A.  I would say no.  We wouldn't stay in business

19   long giving away microwaves.

20      Q.  Continuing to look at these tasks, you

21   mentioned the type recap.  Tell me when you saw

22   that -- what alerted to you that being an

23   administratively exempt duty?

24      A.  The type the recap is because -- it's a

25   condensed version of what the approval is, making it

Holly Jo Kirk    9/27/2018

1    more user-friendly for the -- for the field so that

2    they know what is expected of them.  Just like I was

3    saying earlier, something is not approved.  It may

4    still show up on that bid, or it may even show on

5    approval.  If it's not approved, though, we don't want

6    somebody doing that.  So it was their responsibility

7    to make sure that that was omitted from a recap.

8        Q.  So there are certain items that need to be

9    included in that recap; is that right?

10       A.  Yes, uh-huh.

11       Q.  And who decides what goes into a recap?

12       A.  The CSR.  The -- it's based off of the

13   approval.

14       Q.  Okay.  But how does the CSR know what to

15   include in the recap?

16       A.  From the approval.

17       Q.  Okay.

18       A.  That is provided by the bank.

19       Q.  And they're recapping certain pieces of the

20   approval?

21       A.  No.

22       Q.  You said it's condensed down.  How do they

23   know what to condense it down to?

24       A.  That's part of their training, that they just

25   know what's -- they know what's pertinent information.

Holly Jo Kirk     9/27/2018

1      Q.  Okay.  As determined by the company?

2      A.  As -- as the CSR, they know -- okay, they

3   need to know that there's -- and I -- I'm hesitant in

4   giving examples because I didn't do recaps; but I

5   would say for an example, it would be like you --

6   it -- you'll do Sheetrock repairs as needed.  Okay.

7   Or you do 24 feet of -- 24 square feet of Sheetrock

8   repairs.

9           So they take that information from that

10  actual approval.  And instead of it having -- you

11  know, you're going to do 24 feet here and you're going

12  to do 15 feet there and you're going to do, you know,

13  blah, blah, blah and put all that -- they would

14  condense it down telling the -- telling them you're

15  only going to do Sheetrock repairs as needed, not

16  giving them specifics of what area.

17     Q.  Okay.

18     A.  Does that kind of help?

19     Q.  They know that because that's what REO wants

20  them to do as CSR's?

21     A.  Well, that's what they're trained to do, yes.

22     Q.  That was my question.  So Ms. Caldwell is not

23  making up or deciding not what to put in the recap?

24     A.  Well, she's determining what information

25  needs to go on the recap, yes.

Holly Jo Kirk    9/27/2018

1        Q.  Based on what?

2        A.  Her own judgment of -- and her training of

3   knowing what she's supposed to be looking for.

4        Q.  What kind of judgment is she using?  How is

5   she using judgment?

6        A.  Quite often, she uses judgment whenever she's

7   taking this line, "do I need to put this on there; do

8   I need to order this; do I not order this."

9              You know, she -- she is just like

10  whenever you take this, do I look at this and do I

11  give you every single little thing on here.  You know,

12  you're using -- I'm using my judgment -- same thing

13  with the recap.

14             You take that approval, and you

15  determine what's pertinent information that needs to

16  be communicated to someone else and -- or what's not

17  pertinent.

18       Q.  And how does she know what's pertinent or not

19  pertinent?

20       A.  It comes from being in the industry and from

21  doing your job and knowing what you're doing.

22       Q.  From the training, is that what you said,

23  also?

24       A.  Yeah, from the training.

25       Q.  So it comes from the company?

Holly Jo Kirk     9/27/2018

1       A.  Yeah, I mean you can't -- I couldn't sit you
2   in there and let you do it.  I couldn't go in there
3   and sit down and do it because I haven't done it in so
4   long.
5       Q.  I believe that for me.  Let's look back.
6   What other of these tasks jump out at you as
7   administratively exempt?
8       A.  Okay.  I would say update and revise
9   Whirlpool order forms as needed.
10      Q.  What kind of independent judgment or
11  discretion is Ms. Caldwell using in doing that?
12      A.  Determine if there needs to be a change to
13  that -- to what appliances were supposed to be ordered
14  or not because she has the authority to order what
15  needs to be ordered.
16      Q.  How would she know what needs to be ordered?
17      A.  I'm going to say off of the approvals.
18      Q.  So it's --
19      A.  It's whatever was bid off the job, you know.
20      Q.  Okay.  So she's looking -- she's ordering
21  based on the approval approved by somebody else?
22      A.  Okay.  I would say that's a -- a correct
23  statement because it's -- the approval comes from the
24  customer.
25      Q.  Okay.  Anything else on this first page that

Holly Jo Kirk    9/27/2018

1    you see that would be exempt duties, in your opinion?

2        A.  Send e-mail to Whirlpool.

3        Q.  Okay.  And why is that?

4        A.  Have -- because she's using discretion that

5    it's time to order the appliances.

6        Q.  So she doesn't have to order the appliances?

7        A.  Yeah, that's her job.  That's part of her

8    administrative job.

9        Q.  Okay.  So where is the discretion?  If she

10   has to do it, what choice does she have?

11       A.  In her position, that would be part of her

12   duties to do that.  So I don't -- I guess I'm not

13   understanding what your question is.

14       Q.  So if Ms. Caldwell said "I have all this

15   discretion; I'm not going to send that e-mail today,"

16   what would happen?

17       A.  She wouldn't send it, and she could have the

18   discretion to send it the next day so --

19       Q.  What if she never sent it?

20       A.  Well, she -- she wouldn't have a job because

21   that was part of her job.

22       Q.  Exactly.  So it was required for her to do

23   that?

24       A.  As part of her position, yes, it was the

25   requirement.

Holly Jo Kirk      9/27/2018

1      Q.  Okay.  What else?

2            MR. CLARK:  Are you talking about Page 1

3      still or --

4      Q.  (BY MR. GASPER)  If you see anything else on

5      Page 1 that is, in your opinion, an administrative

6      task --

7      A.  Okay.  Send e-mail -- see, some of this

8      stuff, I'm not for sure because she's saying "send

9      e-mail if 1093 and Whirlpool order form don't match."

10     Okay.

11           "Scan Whirlpool 1093 and order form."

12     "Have Kelvin approve appliance order."  Some of this

13     stuff, I was not privy to, so I'm not up to speed on

14     it.  "Send MFS e-mail listing appliances for a quote."

15     Q.  Sorry.  Just for the record, are you just

16     reading right now?  Or these are things that you think

17     are significant or exempt?

18     A.  For the most part, I mean it's -- I'm reading

19     and -- I guess I'm not answering your question on

20     that, am I?  I'm mainly reading.  "Review MS

21     assessment for pricing and errors."  I would say I am

22     answering the question on that one.

23     Q.  Okay.  That's an exempt function why?

24     A.  Because she's going to make sure that our

25     money is there.

Holly Jo Kirk    9/27/2018

1      Q.  And what is she comparing the estimate to for

2   pricing?

3      A.  Again, I'm assuming.  I don't know.

4      Q.  How would you know there's an error?

5      A.  I'm not for sure because I don't -- if she's

6   checking for pricing and errors, I'm assuming that if

7   she sees -- maybe she has a price sheet from MFS

8   because she sends -- she sends them an e-mail listing

9   appliances for a quote.  Okay.  She states that above.

10  Okay.

11          So for the quote, whenever the estimate

12  comes in, I'm assuming she's going to verify that

13  quote against what they've sent in for their estimate.

14     Q.  Okay.

15     A.  And then if something doesn't match, what

16  they've estimated versus what we did.  I would say

17  that that would be it.

18     Q.  What would she do if something didn't match?

19     A.  She would contact them.  She would contact

20  whoever the -- the supplier is stating, "hey, this

21  isn't matching; you know, we need to either get it

22  corrected or have them send a credit or whatever."

23     Q.  She couldn't do that on her own?

24     A.  I'm sorry.

25     Q.  Could she do that on her own?

Holly Jo Kirk     9/27/2018

1      A.  Well, no, the customer -- the vendor is going

2   to have -- you know, they're not going to want her

3   just changing prices on them.

4      Q.  If she's lowering prices --

5      A.  Well, we try to be pretty ethical and notify

6   them, hey, this says it's $20 and, you know, your

7   price sheet is showing it should be 60.  Cheri is

8   ethical.  I don't think that she would not notify them

9   about that either because she would think there was

10  something wrong.

11     Q.  That they would have to address?

12     A.  Uh-huh.  (Mumbling.)

13         COURT REPORTER:  I'm sorry?

14         THE WITNESS:  I'm reading to myself.

15  I'm sorry.

16     A.  Okay.  She had to gather information for a

17  change order.  She would send a notice to Kindale of

18  any adjustments information or important details and

19  ECD's.  That's giving somebody notification.

20     Q.  (BY MR. GASPER)  Okay.  So -- gathering

21  information for a change order --

22     A.  Uh-huh.

23     Q.  -- what discretion is she using in doing

24  that?

25     A.  I would say whatever is needed to make -- to

Holly Jo Kirk    9/27/2018

1    A.  So, yeah, I mean if she's put it down in her

2    e-mail that she did it, I would -- I would take that

3    as her having done that.

4    Q.  Where does it say here that she signed off on

5    changes for less than $100?

6    A.  It's -- I don't know that it says that on

7    this e-mail.  And I don't know that it says it on the

8    other e-mail, but there are other factors in there

9    that it is does state things that would classify her

10   as administrative.  So I don't know that that one

11   particular thing makes her just a salary exempt

12   employee.

13   Q.  Okay.  What else on here on this list?

14   A.  Did I answer your question?  Did I understand

15   your question?  Okay.

16        MR. CLARK:  He's moved on to --

17   Q.  (BY MR. GASPER)  I'll let you know.

18   A.  Okay.

19   Q.  Us lawyers will definitely keep talking if

20   not.

21   A.  Again, we're back to change orders.  You've

22   got me now gun shy on change orders.  "Provide repair

23   updates for change orders."  "Check in appliances."

24   "Provide repair updates for rehabs."

25   Q.  And what decisions are going through

Holly Jo Kirk    9/27/2018

1    Ms. Caldwell's mind as she's doing this?

2         A.  Well, I don't know what Ms. Caldwell thinks

3    while she's doing things; but she's determining what

4    information needs to be relayed to our customer.

5         Q.  And how do you know what information needs to

6    be relayed?

7         A.  How do she know what information --

8         Q.  Versus me going in there today, I have no

9    idea what to send to your customer.

10        A.  Uh-huh, that's right.

11        Q.  Ms. Caldwell, I assume, knew, right?  How did

12   she know what went into that?

13        A.  From -- from experience, from knowing what

14   the customer is going to require of her, what the

15   customer is going to ask of her, they -- the items

16   that they need to know on what the status of the job

17   is, what, you know -- they -- what the customer is

18   going to need to be able to relay to their -- to the

19   bank and information that she's gathered from the --

20   the QC, from the field people on what the status of

21   the job is, on where we're at and what is needed, what

22   needs -- if there's troubleshooting that needs to be

23   done, if there's communication that needs to be had

24   with the customer.

25        Q.  So she's almost like kind of a hub, like

Holly Jo Kirk     9/27/2018

1    getting -- like get -- in the middle of getting

2    information from these sources and then spitting it

3    back out, so to speak, with these provider care

4    updates?

5        A.  On occasion, yes.

6        Q.  I believe I cut you off before, but I don't

7    want to mess anything up here so --

8        A.  Okay.  "Order the flooring."  "Send an e-mail

9    to the broker revising the ECD through Equator."

10       Q.  Ordering the flooring --

11       A.  Uh-huh.

12       Q.  -- is an exempt duty?

13       A.  It's an administrative duty.  So yeah, it's

14   a --

15       Q.  And what kind of discretionary, independent

16   judgment is Ms. Caldwell using in ordering flooring?

17       A.  I'm not for sure what procedure she takes on

18   ordering the flooring.

19       Q.  Okay.

20       A.  So I can't answer that exactly other than

21   that would be an administrative type duty that we had.

22       Q.  Do you-all have a vendor for flooring?

23       A.  We do have vendors, and then we also had our

24   own -- other entity that was a flooring company that

25   we used.

Osteen & Associates Reporting Services
817-498-9990